PD-1587&1588-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 12/7/2015 12:00:00 AM
Accepted 12/7/2015 2:46:50 PM
ABEL ACOSTA
CLERK

NO. _____

## IN THE TEXAS COURT OF CRIMINAL APPEALS

_____

**Jamelle Shaquil Rasberry**

**v**

**State of Texas**

_____

**Appealing in Cause Numbers NO. 02-14-00141-CR and
NO. 02-14-00128-CR
From the Court of Appeals for the Second District of Texas at Fort Worth**

_____

**PETITION FOR DISCRETIONARY REVIEW**

_____

Max J. Striker
State Bar No. 24058138
3000 East Loop 820
Fort Worth, Texas 76112
817.262.0758
maxstrikerlaw@yahoo.com
Attorney for Appellant

FILED IN
COURT OF CRIMINAL APPEALS

December 7, 2015

ABEL ACOSTA, CLERK

## Identity of Parties and Counsel

| | |
|---|---|
| Appellant/Respondent: | Jamelle Shaquil Rasberry |
| Trial Counsel for Appellant: | HON. BRIAN SALVANT<br>SBOT NO. 2008387<br>HONORABLE DAVID T. OWENS<br>SBOT NO. 24004849<br>610 E. Weatherford Street<br>Fort Worth, Texas 76102<br>(817) 334-7997 |
| Appellate Counsel for Appellant: | HON. MAX J. STRIKER<br>SBOT NO. 24058138<br>3000 East Loop 820<br>Fort Worth, Texas 76112<br>817-262-0758 |
| Appellee: | State of Texas |
| Trial Counsel for Appellee: | HONORABLE JOSHUA D. ROSS - SBOT NO. 24046760 HONORABLE TIFFANY D. BURKS - SBOT NO. 24003812 Assistant District Attorneys<br>401 W. Belknap Street<br>Fort Worth, Texas  76196<br>Telephone:  (817) 884-1400<br>Facsimile:  (817) 212-6973 |
| Appellate Counsel for Appellee | Charles M. Mallin<br>Tarrant County District Attorney<br>Fort Worth, TX 76196<br>817-884-1624<br>State Bar No. 12867400 |
| Trial Court: | Criminal District Court Three |

Trial Judge: Hon. Jerry Woodlock

# Table of Contents

Identity of Parties and Counsel…………………………………………….....2

Table of Contents…………………………………………………………….…..3

Index of Authorities……………………………………………………………..5

Statement Regarding oral argument…………………………………………….....6

Statement of the case………………………………………………………………7

Statement of Procedural history………………………………………………….....9

Reasons for Review…...……………………………………………………………...10

Argument and Authorities…………………………………………………………11

    I.  The court of appeals of appeals erred in this case when it did not apply the "Zone of Reasonable Disagreement" standard when determining abuse of discretion in the admission or exclusion of evidence in appellants issues 3, 4 and 5………..……………………………………………………………..11

        A. Zone of Reasonable Disagreement Standard………….…………………..11

        B. Decision on Appellant's Issue Three………………………………...12

        C. Decision on Appellant's Issue Four………………………………12

        D. Decision on Appellant's Issue Five…………………………….……..13

Conclusion ........................................................................................14

Prayer for Relief…………………………………………………………….15

Certificate of Service .........................................................................16

Certificate of Compliance…………………………………………………………...17

Appendix…………………………………………………………………………….18

# Index of Authorities

**Cases**

*Allen v. State,* 436 S.W.3d 815, 826 (Tex.App.-Texarkana 2014)…………11

*McDonald v. State,* 179 S.W.3d 571, 576 (Tex. Crim. App. 2005)………11

*Melton v. State,* 456 S.W.3d 309, 315 (Tex.App.-Amarillo 2015)………...11

*Montgomery v. State,* 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g))……………………………………………………………...11

## Statement Regarding Oral argument

Because Appellant believes there is an issue of statewide importance, Oral Argument is requested.

## Statement of the Case

On   August 13th, 2012, Appellant, Jamelle Shaquil Rasberry, plead guilty in case no. 1236741D to one count of Assault of a Family or Household Member with Previous. (CR at 14-20) He signed written admonishments and the court sentenced Appellant to three years Deferred Adjudication (CR at 21).  A petition to proceed to Adjudication was filed on May 3rd, 2013(CR at 30).

On June 18th 2013 Appellant was indicted on one count of Felony Murder in cause no. 1322031D (CR at 6).  A trial was held for both cases on March 17, 2014. (CR at 8).  At the same time, and in the same process, the court considered the petition to revoke probation. On April 2nd 2014 the jury found Appellant guilty of capital murder in cause number 1322031D and sentenced Appellant to Life (CR at 112).

In the same trial, the court found that Appellant had violated the terms of his probation and sentenced Appellant to 7 years for Assault of a Family or Household Member with Previous in cause no 1236741D(CR at 102). Both sentences were to be served concurrently in the Institutional Division of the Texas Department of Criminal Justice (CR at 102; CR at 102).

A panel of the Second Court of Appeals dismissed the affirmed the judgment of the trial court on October 15th 2015.  A motion for rehearing was filed but denied on November 12th 2015. Appellant now files this Petition for Discretionary Review.

## Statement of Procedural History

A panel of the Second Court of Appeals affirmed the judgment of the trial court, handing down its memorandum opinion on October 15th 2015. A Motion for Rehearing and Rehearing En Banc was filed by Appellant on October 29th 2015. The Motion for Rehearing and Rehearing En Banc was denied on November 12th 2015.

## Reasons for Review

I.  Is the "Zone of Reasonable Disagreement" standard the correct standard in determining abuse of discretion in the admission or exclusion of evidence?

**I. The court of appeals erred in this case when it did not apply the "Zone of Reasonable Disagreement" standard when determining abuse of discretion in the admission or exclusion of evidence in appellant's issues 3, 4 and 5.**

    A. Zone of Reasonable Disagreement Standard.

        When reviewing a trial court's decision to admit or exclude evidence for an abuse of discretion a trial court abuses its discretion only when its decision "is so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005) (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g)).

        Other Appellate courts have used this "Zone of Reasonable Disagreement" standard. See *Melton v. State*, 456 S.W.3d 309, 315 (Tex.App.-Amarillo 2015) and *Allen v. State*, 436 S.W.3d 815, 826 (Tex.App.-Texarkana 2014). However, in the case at bar that standard was

not used. In this case there were three appellate issues involving admission or exclusion of evidence- Appellants issues 3, 4 and 5.

## B. Decision on Appellants Issue Three

In issue three, appellant contends that the trial court abused its discretion by refusing to admit a prior written statement by a witness that conflicted with the witness's trial testimony. (Mem. Op. p32). After an analysis the court concluded that "Because appellant never attempted to admit only the inconsistent statements, we conclude and hold that the trial court did not abuse it's discretion by excluding the evidence." (Mem. Op. p33). There was no mention of a "Zone of Reasonable Disagreement". Id at pgs32-33).

## C. Decision on Appellants Issue Four

In Appellants fourth issue, appellant contends that the trial court abused its discretion by admitting photographs that are substantially more prejudicial than probative. (Mem. Op. p34). The court did an analysis of the admission of three exhibits- States 15, 63, and 72 -under Texas rules of evidence 403 and 401 and concluded in each case that the trial court had not

abused its discretion. (Mem. Op. p34- 38). Here again, there was no analysis under the "Zone of Reasonable Disagreement" standard. (Id. at pgs32-33).

D. <u>Decision on Appellants Issue Five</u>

Appellant's 5th issue, appellant contends that the trial court abused its discretion by allowing the state to call a witness for the sole purpose of impeaching him with inadmissible hearsay evidence (Mem. Op. p38). After an analysis using evidence rules 607 and 403, the court concluded and held that "the trial court did not abuse it's discretion by overruling appellants objection because the record does not show the State knew Dorsey would deny having made the statements….." (Mem. Op. p38-40; 41). There was no mention of a "Zone of Reasonable Disagreement" nor did there appear to be any attempt to consider whether *anyone* could disagree with the conclusion as to what Dorsey's testimony would be. (Id).

## **Conclusion**

The Court of Appeals has decided an important question of state law in a way that conflicts with the applicable decisions of the Court of Criminal Appeals. Here, the court of appeals in this case did not use the "Zone of Reasonable Disagreement" standard that of other state appellate courts have used when determining abuse of discretion in admission of exclusion of evidence cases. It is clear that the court of appeals did not use the" Zone of Reasonable Disagreement standard. Therefore, the Court of Appeals ruling is in error as it conflicts with the rulings by the Court of Criminal Appeals and other state appellate courts making use of this standard. The issue is worthy of review by Court of Criminal Appeals because the standardization of judgements is an issue of fairness and of statewide importance.

## **Prayer or Relief**

WHEREFORE, PREMISES CONSIDERED, Appellant prays that this Court grant this PDR, overturn the ruling of the appeals court and grant such other and further relief as the Court may deem appropriate.

Respectfully submitted,

/s/ MAX J. STRIKER
Max J. Striker
State Bar No. 24058138
maxstrikerlaw@yahoo.com
3000 East Loop 820
Fort Worth, Texas 76112
817-262-0758

## Certificate of Service

I hereby certify that a true and correct copy of this brief has been served on the following persons or parties on this the 7th day of December, 2015:

State Prosecuting Attorney
P.O. Box 13406
Capital Station
Austin, TX 78711-3046
information@spa.texas.gov
via certified mail and email


Debra Windsor
Tarrant County Assistant District Attorney
Chief, Post Conviction
401 W. Belknap
Fort Worth, Texas 76196-0201
via U.S.P.S. Certified Mail, return receipt requested

Jamelle Rasberry
TDCJ 01919322
Bill Clements State Jail
9601 Spur 591
Amarillo, TX 79107-9606
VIA U.S.P.S. Certified Mail, return receipt requested


/s/Max J. Striker
Max J. Striker

16

## <u>Certificate of Compliance</u>

I hereby certify that the word count indicated by my computer calculation is 1,499.


        <u>/s/Max J. Striker</u>
        Max J. Striker

Appendix Materials



# COURT OF APPEALS

**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

**NO. 02-14-00128-CR**
**NO. 02-14-00141-CR**

JAMELLE SHAQUIL RASBERRY                                    APPELLANT

V.

THE STATE OF TEXAS                                                    STATE

----------

FROM CRIMINAL DISTRICT COURT NO. 3 OF TARRANT COUNTY
TRIAL COURT NOS. 1322031D, 1286741D

----------

## MEMORANDUM OPINION[1]

----------

In two cause numbers, Jamelle Shaquil Rasberry appeals from his conviction and life sentence for capital murder and from a judgment adjudicating him guilty of aggravated assault on a family member after the revocation of his deferred adjudication community supervision for committing the new offense of capital murder. In seven issues, he challenges the sufficiency of the evidence to

---

[1]*See* Tex. R. App. P. 47.4.

support his convictions and to corroborate an accomplice-witness's testimony (issues one, six, and seven), the trial court's allowing the State to question its own witness using what appellant alleges was a leading question (issue two), the trial court's refusal to admit the accomplice-witness's prior written statement to police into evidence (issue three), the admission of three photographs that appellant contends are substantially more prejudicial than probative (issue four), and the trial court's allowing the State to call a witness for the purpose of impeaching him with a prior statement to police (issue five). We affirm.

### Sufficiency of the Evidence

Because appellant's first issue is that the trial court erred by denying his motion for directed verdict, a sufficiency-of-the-evidence challenge, we will discuss the background facts within our discussion of the issue. *See Canales v. State*, 98 S.W.3d 690, 693 (Tex. Crim. App.), *cert. denied*, 540 U.S. 1051 (2003).

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). The State charged appellant with intentionally committing murder in the course of robbing or attempting to rob Johnny Williams. The State also charged four other men with the same offense: Jason Villareal, who acted as a lookout and testified against appellant, cousins Jonathan Martin

2

and his cousin Corwon Martin,[2] and Javier Cordova, Villareal's cousin. A jury convicted appellant of capital murder in trial court cause number 1322031D, and in trial court cause number 1286741D, the trial judge found that appellant had committed the new offense of capital murder, revoked his deferred adjudication community supervision, and adjudicated him guilty of aggravated assault of a family member.

**The Crime**

The State began by playing a 911 call for the jury. A woman can be heard telling the dispatcher that a man has been shot at the Woods of Eastchase apartments. A man can then be heard, who explains to the dispatcher that he heard a bang, went outside, and saw a man who had been shot lying on the ground. The caller tells the dispatcher he thinks he might know the man who had been shot; when asked the man's condition, the caller says that he thinks the man is dead. The caller can be heard knocking on a door and asking someone if the man might be "your dude." The call ends with a woman screaming repeatedly.

**Terry Cesar**

Terry Cesar testified that in December 2012, he lived in the Woods of Eastchase apartments on Ederville Road in east Fort Worth. At 4:30 a.m. on December 28, 2012, he was awake watching TV when he heard faint voices

---

[2]All references to "Martin" in this opinion are to Jonathan Martin.

3

outside that sounded like two men talking.  He heard a man with whom he was familiar say, "Man don't"; a second man responded, "Fuck that."  Cesar thought the first man sounded as if he knew the second man.  Cesar then heard a loud bang that sounded like a gunshot.

Cesar went outside and saw the man who had said, "Man don't," lying face up on the ground behind the building and another man standing at that man's feet.  The man who was standing was wearing a hoodie that looked black but had white designs on the back of it and very dark pants.  The man in the hoodie "kind of looked" at Cesar and then ran away from him; Cesar was not able to see his face.  Likewise, Cesar never saw a gun or the person holding anything.

Cesar was scared, so he had his girlfriend call the police.  He then went back to the man who had been shot and stayed with him.  They did not speak because the man was choking on blood.  Cesar recognized the man as someone he had seen at the apartments before.  At some point, Cesar went to the apartment where the man's girlfriend lived and told her that a man who could be her boyfriend had been shot and was lying on the ground outside the apartments.  She came outside, and when she saw the man lying on the ground, she ran over to him.  Cesar heard her say, "[T]hey shot him," and then she screamed.  She also went through the man's pockets; she "took something out [of] . . . his left pocket . . . and balled it in her hand," and she took the man's phone.  She then ran into her apartment and locked the door.  Cesar waited with the man until the police arrived.

4

Cesar thought the man in the hoodie had been trying to rob the other man because he did not run away immediately when Cesar came outside. Cesar admitted, however, that he did not see the man in the hoodie going through the other man's pockets. Cesar also admitted he had just assumed the man in the hoodie had been trying to rob the other man because of "the senseless crime that [had been] happening" in the area.

**Bradley Cantu**

Fort Worth Police Officer Bradley Cantu testified that he was dispatched to a shooting at 4:26 a.m. on December 28, 2012. He arrived about five minutes later with another officer. Cesar's girlfriend flagged them down when they drove into the complex. Officer Cantu found a black male, whom he identified as Williams, lying face up on the sidewalk and a woman who identified herself as Alice Davis standing over him screaming and crying. Officer Cantu also saw Cesar standing there. Officer Cantu checked for Williams's pulse but could not feel one. The paramedics pronounced Williams dead at the scene.

Officer Cantu went with Davis to her apartment so that he could question her. Davis told Officer Cantu that she had spoken to Williams around midnight, and he was going to bring her some food. Other officers found Williams's car in the parking lot of the apartment complex. After Officer Cantu learned that Davis had taken a cell phone out of Williams's pocket, he took her to his patrol car to question her further. He confiscated a cell phone Davis had with her in the patrol car.

**Tyrone Glapa**

Officer Tyrone Glapa, a crime scene search officer, was also called to the scene. The State introduced his photographic documentation of the scene into evidence. Officer Glapa also searched Davis's apartment and found a disassembled cell phone under a pillow in the bedroom.

**Alice Davis**

Davis testified that appellant is her oldest child's father. At the time of trial, she had known appellant for seven years. She said that everybody called him L.A. By the time of the shooting, Davis and appellant were no longer in a relationship, and she was dating Williams. Williams was a successful drug dealer. Davis said that appellant did not like her relationship with Williams because "if he can't have me, can't nobody have me." She also said that appellant just did not like Williams.

In March 2012, Child Protective Services investigated whether Davis's home was suitable for her and appellant's child and placed the child in foster care; one of the main reasons for the removal was that Davis was helping Williams sell drugs. Appellant was angry about the removal and said it was Williams's fault. Appellant asked Davis at least five times to help him rob Williams. She thought appellant talked about robbing Williams when he was out of money, and he said things to make her think that he should have some of Williams's money. She refused.

6

The couple's child was still in foster care at the time of the shooting. The day before, Davis had attended a CPS-required class and visited their child. She talked to appellant that day and told him he needed to complete his classes; he responded that "he shouldn't have to do no classes because it's [Williams's] fault that [the child] got took." He was angry. That same day, appellant told her again he wanted to rob Williams, "to set him up." She told him no.

Davis typically communicated with appellant on his mother's cell phone.

On December 28, 2012, Davis was expecting Williams to come home around 3:00 or 4:00 a.m.; he had been staying with her at the apartment. Davis said that after she found out that Williams had been shot, she took his cell phone to call his uncle but it was locked; she took it with her when she ran into her apartment to use her cell phone. She said initially that Williams's phone came apart in the apartment because it kept ringing, so she threw it; Davis admitted later, however, that she had taken the phone apart. Davis said she had checked Williams's pockets for drugs at his aunt's suggestion, but she did not find any. She also said she had found money but left it in his pocket.

When a detective interviewed Davis after the shooting, she did not tell him everything at first because although she suspected appellant had shot Williams, she did not want to accuse her child's father unless she was sure. Davis testified that she had told the detective that appellant did not know where she lived and

7

thought she lived in Arlington.[3]  She agreed that the detective had said to her during the interview, "[T]his ain't a robbery."  But she thought the motive was robbery nevertheless.  Appellant did not have a job, nor did he make the kind of money Williams did.  Williams supported her and her child but appellant did not.  Davis also confirmed that appellant was the only one of the other men charged who knew Williams.

**Walter Battles**

Walter Battles was also a resident of the Woods of Eastchase apartments.  From the evening of December 27, 2012 through early morning December 28, he noticed a dark blue Chevy Impala in the parking lot "just moving around the apartments, going in and out, changing spots."  It made him nervous.  At some point, he decided to check out the car; it was parked next to a dumpster, and under the guise of taking out some garbage, he checked on the car's occupants.  Battles said there were two Hispanic males in the car, and he talked to them.  They were not doing anything other than sitting in the car talking.  By the time Battles got back to his apartment, they had moved, but the car was still in the complex.  Battles identified a photograph of the Chevy Impala.  He also testified that he might have seen just a glimpse of a silver car.

---

[3]Davis had a protective order against appellant at the time, but she communicated with him regularly.

8

**Jason Villareal**

Villareal testified that he had also been charged with the capital murder of Williams. He admitted that he hoped for leniency in exchange for his "fair and straight" testimony but that he had not made a deal with the State. Villareal testified that he did not know Williams, but he did know L.A. and identified him as appellant. Villareal is a tattoo artist and had tattooed appellant several times.

According to Villareal, on the night of December 27, 2012, appellant came over to Villareal's apartment with two friends. One had dreadlocks and was wearing a green jacket; Villareal learned later that he was Martin. Villareal did not remember what the other man looked like. At first, the men talked about tattoos, but then appellant and his friends started talking about committing robbery and getting a gun. They had a couple of handguns with them, but the guns were not working. They told Villareal they needed "something that works," so Villareal gave them a .410 shotgun and ammunition. Initially, Villareal wanted $50 for the gun, but appellant did not have the money. Appellant told Villareal he would pay him more than $50 from the proceeds of the robbery.

After Villareal gave the three men the gun, Villareal's cousin Cordova came over to the apartment and heard appellant and his friends talking about the robbery. Villareal suggested to Cordova that the two of them follow appellant and his friends to wherever they were going. Villareal and Cordova drove in Cordova's blue 2011 Chevy Impala, and appellant, Martin, and possibly the other man drove in a silver car. Villareal identified Cordova's car from a photograph; it

9

was the same photograph from which Battles had identified the car he had seen in the apartment complex.

Villareal and Cordova went to the Wells Fargo by the Woods of Eastchase apartments. Martin and appellant pulled up in the silver car and told Villareal and Cordova to wait and look for a silver Pontiac with blue headlights. According to Villareal, he and Cordova were at the Wells Fargo for about an hour until a man came over to throw away trash. That man talked to them, which made them nervous; they moved into a nearby Burger King parking lot where they stayed for two or three hours. While they were sitting in the Burger King parking lot, they saw the Pontiac. It was around 3:30 or 3:40 a.m. Villareal called appellant at a different phone number than appellant's usual number.

After a little while, Villareal and Cordova saw headlights from a car that appeared to be leaving the apartment complex; they followed because they thought maybe appellant was leaving the scene without paying them. Eventually, they caught up to appellant and Martin at a Valero station.[4] Appellant and Cordova both got out of the cars and "exchanged some words." Appellant then opened Cordova's car door, threw the shotgun in, and told Villareal and Cordova that he would meet them later. Villareal could smell something that he described

---

[4]The evidence showed that there was a Valero station east of the intersection of Eastchase and Meadowbrook, just northeast of the Woods of Eastchase apartments.

being like a gun's having been fired, but he did not see any shooting. They each went their separate ways.

Villareal later called appellant and told him to come pick up the gun even if he could not pay for it. Villareal and Cordova went back to Villareal's apartment that night and left the Impala unlocked in the parking lot. When they woke up around noon or 1:00 p.m. on December 28, 2012, the shotgun was gone.

Villareal met with Detective Thomas O'Brien of the Fort Worth Police Department and told him mostly everything that he testified to at the trial except for the following: he did not tell Detective O'Brien that he had sold appellant the shotgun; he did not tell the detective that appellant had brought a man other than Martin to Villareal's apartment; and he told the detective he did not know anything about a robbery until he got to the Wells Fargo but that appellant was going to pay him to be a lookout.[5] Villareal gave Detective O'Brien consent to search his phone. Villareal saw appellant one time in jail; appellant gave him a hug and told him not to say anything.

**The Investigation**

**Thomas O'Brien**

Fort Worth Police Detective Thomas O'Brien spoke with Davis both at the scene and later at the police station. He admitted that when he was interviewing

---

[5]At trial, Villareal testified that he and Cordova went to the apartment complex because he was bored and thought he would get his money for the shotgun out of whatever appellant and his friends got.

11

Davis, he told her that he did not think the motive of the shooting was robbery because she was very focused on the robbery aspect, and he wanted her to tell him if Williams had any enemies. She was reticent about giving him information. After appellant came to his attention as a possible suspect, Detective O'Brien confirmed with Williams's family that Davis had spoken with them by phone just after the shooting. Williams's phone was locked, and Detective O'Brien could not extract any data from it; when he had a forensic data dump performed on it,[6] the attempt caused the phone to be wiped clean and reset to factory settings.

Detective O'Brien received a tip that Danny Dorsey, also known as Ray Ray, might know something about the shooting. When Detective O'Brien interviewed Dorsey, he asked Dorsey who L.A. is, and Dorsey answered that L.A. is appellant. Dorsey also said appellant has L.A. tattooed on his body, which Detective O'Brien verified; the trial court also admitted a photograph of appellant that shows his tattoo. According to Detective O'Brien, Dorsey told him that on the evening of December 27, 2012, appellant called him maybe around 7:00 or 8:00 p.m. and asked for some bullets for a .38 or 9mm.[7] Dorsey suggested that appellant's brother Phillip could get them the next day, but appellant said, "[N]o, I got to do something tonight." Dorsey told Detective

---

[6]A forensic data dump consists of "isolat[ing] the phone from the network to prevent any changes to the network for the phone updating, calls, or . . . receiving . . . a kill signal. . . . and then . . . mak[ing] a data extraction from it."

[7]When the State questioned Dorsey in the trial, he denied knowing appellant or anything about the offense.

12

O'Brien that appellant asked him for a ride, but Dorsey did not have a car. Dorsey further told Detective O'Brien that he heard about the shooting around 10:00 a.m. on December 28, 2012.

Also during the interview, Dorsey said that appellant had previously pulled a gun on "his baby mama's boyfriend or baby mama's man" and that appellant had told Dorsey that he wanted to rob Williams. Dorsey said several times during the interview that appellant had told him that Williams had "a lot of dope and money on him." Appellant also told Dorsey, "I'm going to get him one day." Dorsey told Detective O'Brien that appellant knew where Williams lived and what time he usually came home. When Detective O'Brien asked Dorsey if he thought appellant had shot Williams, Dorsey said he did. But Dorsey also said during the interview that he did not want to be a snitch.

Dorsey confirmed Martin's cell phone number for Detective O'Brien and also told him that the only person he thought appellant could have gotten a ride from was a person who matched Martin's description. The State played the recording of a subsequent interview Detective O'Brien had with Dorsey for the jury. Dorsey never seemed high or incoherent when Detective O'Brien interviewed him. Detective O'Brien was able to corroborate most of what Dorsey told him.

In addition to interviewing Dorsey, Detective O'Brien got warrants for the records for Martin's cell phone, appellant's mother's cell phone,[8] and Dorsey's cell phone. Detective O'Brien found twenty calls between Dorsey's phone and appellant's phone over a three-month period. He also found three calls between Dorsey's number and Martin's on the night of December 27, 2012: one at 11:05 p.m., another at 11:16 p.m., and a final one at 11:17 p.m. Those three calls were the only ones between Dorsey's phone and Martin's within a three-month period before the shooting. Likewise, the only calls between Villareal's and Martin's phones within a three-month period before the shooting were from December 27 to December 28, 2012; from a six-hour period beginning at 11:00 p.m. on the 27th and ending at 5:00 a.m. on the 28th, there are nineteen calls between Martin's phone and Villareal's. But there are over fifty text messages and twenty-five phone calls between Villareal's and appellant's phone over the same three-month period, which indicated to Detective O'Brien that Villareal and appellant were friends but Villareal and Martin were not. Detective O'Brien found no evidence that Martin, Martin's cousin, Villareal, or Cordova knew Williams; the only common link between those four and Williams was appellant.

---

[8]The evidence showed that at least five people had access to and were allowed to use appellant's mother's phone: appellant, his mother, his brother, and his two sisters. But because there is evidence that appellant regularly used the phone, and that Villareal, Davis, and others regularly contacted him on it, we will refer to his mother's phone as appellant's phone for ease of discussion.

14

The phone records show that from December 27 through December 28, the location of appellant's phone never changed from the southwest Fort Worth area near his mother's home. The records also show that from 9:23 p.m. to 9:26 p.m. on the 27th, someone using Martin's phone called appellant's phone ten times in a row. Beginning at 10:44 p.m. through 11:00 p.m. the same night, there were four other calls placed from Martin's phone to appellant's phone. The records reflect that one of the calls from Martin's phone to appellant's phone was made immediately before a call to Villareal's number.[9] Similarly, another call was placed from Martin's phone to appellant's a few minutes before a call was placed from Martin's phone to Dorsey's number. Detective O'Brien opined that appellant was using Martin's phone to call his phone so that he could remotely access the contact list to look up Villareal's and Dorsey's numbers. Detective O'Brien did not find either Dorsey's or Villareal's number in the contacts list on Martin's phone.

Detective O'Brien interviewed Martin twice. At first, Martin denied knowing anything about the shooting. Martin's story about his involvement in the shooting "evolved over time." Detective O'Brien thought that Martin's initial denial was untruthful, but he also thought that Martin became more truthful the more they talked. Although Martin never identified anyone other than appellant as the

---

[9]There are two seconds-long short calls in between. The digits of the numbers are the same as Villareal's but for the area code prefix; the area code prefix for Villareal's number is 682, and the intervening calls used the prefix 817.

shooter, he also denied knowing whether appellant shot Williams. Detective O'Brien also took pictures of Martin's car.

Detective O'Brien obtained red light camera footage from the intersection of Meadowbrook and Eastchase. On a video admitted into evidence, two cars can be seen following each other southbound on Eastchase past Meadowbrook at around 12:29 a.m. on December 28. One appears to be a silver Impala and the other a blue Impala. Both of the cars turn left just past the intersection. Around 4:20 a.m., a silver, light bluish Pontiac can be seen traveling in the same direction and also turning left just past the intersection. The left turn is to Ederville Road, where the apartments are located. Detective O'Brien testified that there is a Valero gas station east of the intersection at Eastchase and Meadowbrook. The location of one of the calls between Martin's and Villareal's phones is consistent with having been made from the Valero.

As a result of Detective O'Brien's investigation, Fort Worth police arrested appellant, Martin, Martin's cousin, Villareal, and Cordova for capital murder. Detective O'Brien was present when the police arrested appellant. Officers found three cell phones and a jacket with appellant. Although the jacket is not a hoodie, it is dark and has what appear to be patches of different company logos on it; many of them have light or white borders or writing on them. Detective

16

O'Brien testified that a person could have worn a hoodie under the jacket, especially in December.[10]

**Duc Nguyen**

Duc Nguyen, a Fort Worth Police Department detective assigned to the digital forensic lab, testified that he performed a forensic data dump of Martin's phone. He was able to extract many photos from the phone, along with the date on and location from which those photos were taken. One of those photos was taken inside a car and shows the car console and a hand holding a handgun. No face can be seen in the photograph. Martin's phone recorded the time the photograph was taken as 10:53 p.m. on December 27, 2012. The time shown on the car's console in the photograph is 10:56 p.m. The location recorded on the photograph was on Woodhaven Drive, which is on the east side of Fort Worth. Detective O'Brien identified the photograph as having been taken from inside Martin's Impala.

**Text Messages and Call Records**

The phone records show that a text message was sent on December 26, 2012 from appellant's phone to Martin's saying, "Dam blood we gotta jack[] o boy on the set."[11] Two messages from appellant's phone to

---

[10]Text messages from appellant's phone on December 28, 2012 indicate that the temperature was as low as thirty-two degrees around 8:30 p.m. on December 28, 2012.

[11]Detective O'Brien explained that "on the set" means something "is definitely going to happen, it's for real."

17

Davis's, sent on December 25 and 26, refer to "o boy": "If u cme over here aint o boy going to be asking wer u at??" and "Ok..wt u wit o boy." Early the next morning, December 27, there is a text from Davis's number to appellant's phone at 2:38 a.m. saying, "hope ya go see" their child. At 9:35 a.m., there is a text from appellant's phone to his sister's phone asking if she was going to see his child that day; there is also a message from appellant's phone to Martin's number about calling CPS. Davis called appellant's phone at 11:26 a.m.; the call lasted nine minutes. At 3:22 p.m., there is a message from Martin's phone to appellant's phone; it references lifting weights. The response from appellant's phone at 3:23 p.m. states, "im liftin right now too at the gym *we fina leav* i been here 3 hours." [Emphasis added.]

The texts continue with one from appellant's phone to Martin's stating, "i.need some weed," and suggesting that they go to someone's house. The texts from Martin's number indicate that the writer needed gas. In between is a series of messages between Davis's number and appellant's phone indicating that Davis was at a CPS class and was wondering why appellant was not there. At 3:36 p.m., there is a message from appellant's phone to Martin's saying, "Cme to my hse." At 3:46 p.m., Davis called appellant's phone, and the conversation lasted five minutes. At 3:55 p.m., there is a message to Martin's phone from appellant's phone stating, "Ayy we need to robb bro tonight on the set I gotcha on the gas."

18

There are no outgoing text messages on appellant's phone from 3:58 p.m. until 8:41 p.m., but there are a series of short outgoing phone calls made between 4:02 p.m. and 4:58 p.m. There is also a forty-five minute outgoing call beginning at 4:58 p.m. After that call, there are only two seconds-long outgoing calls: a twenty-eight second call at 5:12 p.m. and a thirty-five second call at 8:37 p.m. During this time, appellant's phone received but did not answer the ten short calls from Martin's phone about which Detective O'Brien testified.

Additionally, between 8:41 and 10:45 p.m., there are numerous text messages being sent from and received on appellant's phone. The first message at 8:41 p.m. says, "Hey this phillip." From that time until around 10:45 p.m., there are a series of incoming and outgoing messages between appellant's phone and three other numbers; in each conversational thread, the writer of the text from appellant's phone identifies himself as Phillip. There are also several messages between unidentified persons during a seven-minute period from 12:01 to 12:08 a.m. on December 28, 2012 and a one-minute phone call at 12:36 a.m. from appellant's mother's ex-boyfriend; after that, there is no activity on the phone until 5:20 a.m. At that time, a series of short outgoing calls began.

Between 5:22 a.m. and 7:08 a.m., there are ten outgoing, less than one-minute calls from appellant's phone to his mother's ex-boyfriend's number. At 11:22 a.m. on December 28, 2012, the records show a text message from Dorsey's phone to appellant's phone that says, "Call me la or phillip asap."

19

**Mark Sedwick**

FBI Special Agent Mark Sedwick explained how cell phone triangulation works. He performed an examination of cell phone records for Martin's phone and appellant's phone and prepared exhibits with a graphical map showing the locations of calls made to and from each phone between roughly 4:00 p.m. on December 27, 2012 and 6:00 a.m. on December 28, 2012.

Special Agent Sedwick confirmed that on December 27, 2012, there were about ten short calls from Martin's phone to appellant's phone within a three-minute period starting at 9:23 p.m.; all of them lasted under ten seconds. There was no cell phone tower location data for appellant's phone for these calls, which indicated to Special Agent Sedwick that that phone was probably turned off at the time. But Martin's phone utilized a cell tower close to appellant's mother's residence on the southwest side of Fort Worth.

The evidence also showed that a two and a half minute call was placed from Martin's phone to Villareal's at 10:50 p.m. on December 27, 2012. The evidence also showed a call from Martin's phone to Dorsey's phone at 11:05 p.m. on December 27, 2012; this call lasted a little over two minutes. All of these calls were made from locations on the east side of Fort Worth, near the Woods of Eastchase apartments.

The phone records further show that at 11:17 and 11:18 p.m., Martin's phone was used to call Dorsey's and Villareal's; both calls lasted less than one minute. The cell tower utilized for those calls showed that they were made from

20

far southwest Fort Worth, closer to appellant's mother's home and Villareal's residence than the Woods of Eastchase apartments. Finally, a series of calls were made from Martin's phone to Villareal's early in the morning on December 28, 2012. The first call was made at 12:27 a.m. and lasted about four and a half minutes, the second was made at 12:42 and lasted twenty-three seconds, the third was placed at 2:16 a.m. and lasted roughly three and half minutes, and the last one was made at 3:01 a.m. and lasted a little over a minute. According to Special Agent Sedwick, these calls were made from the area of the shooting. One of the exhibits he prepared confirms the coverage area of the two towers used by Martin's phone between 12:30 a.m. and 4:30 a.m. on December 28, 2012.

Special Agent Sedwick testified that he performed the same analysis on appellant's phone, which showed that it never left the general area of his mother's residence in southwest Fort Worth.

**Marc Krouse**

Medical examiner Marc Krouse testified that Williams died from a shotgun wound and that he choked on his blood: "Basically, he bled to death internally, aspirated blood into other parts of his lungs so that he couldn't effectively oxygenate blood and died as a result of that trauma." Krause found shotgun pellets in Williams that appeared to be .410 gauge. Krause also testified that medical examiners found $639 in cash in Williams's pocket: one one-hundred-

21

dollar bill, seventeen twenty-dollar bills, nine ten-dollar bills, fourteen five-dollar bills, and thirty-nine one-dollar bills.

**Lillian Lau**

Lillian Lau was a crime lab criminalist assigned to the firearm and tool mark unit. She examined the pellets removed from Williams and determined that they were number nine birdshot; she also examined the shotgun cup that the medical examiners had found in Williams's chest and determined that it was consistent with a .410 shotgun. The shot that was in the casing had not spread out very much when it hit Williams, indicating that he had been shot at close range.

**Appellant's Alibi Witnesses**

Appellant's mother testified that she, appellant, Phillip, and appellant's youngest sister went to a Fort Worth rec center together on December 27, 2012. They stayed for around five hours and did not get home until around 6:00 p.m. After they ate dinner, she went to her room around 7:00 p.m. to watch television. She went to bed around 10:00 p.m. Appellant was at the house at the time; she did not recall him leaving that night.

Appellant's mother testified that she woke up around 4:50 a.m. when appellant came into her room to use the restroom and talked to her. She knew what time it was because she has "a habit of looking at the clock." She woke up again around 9:30 a.m.

According to appellant's mother, "[a]ll the kids use [her] phone." She said appellant had her cell phone from December 27 to December 28, 2012 because he asked her for it around 9:00 p.m. on December 27 after everyone got back from the rec center. He gave it back to her the next morning.

She knew appellant associated with Martin, who used to date her oldest daughter, but she said she did not know the other defendants or Dorsey. She did not think her other children associated with them either.

The older of appellant's two sisters testified that she was at home sick on December 27 and that her whole family was at the house that night and the next day. Appellant generally slept on her bedroom floor when he stayed at his mother's house; she woke up around 4:00 a.m. on December 28 and noticed that he was asleep there. Between 4:30 and 5:00 a.m., she posted on Facebook that she had been sick and her brother had been taking care of her like he was a doctor. When she woke up again around 7:00 a.m., appellant was still asleep.

At the time of the shooting, appellant's sister had her own cell phone. She admitted that there was no reason for phone records to show calls from her cell phone number to Martin's or Dorsey's phone. Nevertheless, the State introduced evidence of phone records showing a two-minute-and-ten-second call from Martin's phone to hers at 4:53 a.m. on December 28, 2012. She denied speaking to Martin or appellant that night and had no explanation for the call.

Phillip corroborated the testimony that the family went to the gym together and got back to the house around 6:00 or 7:00 p.m. on December 27, 2012.

Phillip testified that he and appellant played a PS3 game from 7:00 p.m. until around 2 a.m. on December 28 and that he went to sleep on the couch in the front room around 2:30 a.m. He never saw appellant leave. He woke up around 9:00 a.m.

Phillip denied knowing anyone named Ray Ray or Dorsey. He had no explanation for why Dorsey would send a text asking for him. Phillip denied using appellant's phone and said that only appellant or their mother did. He also denied sending the "Hey this phillip" message.

**Analysis**

According to appellant, "[a]lthough the jury is free to make inferences from the evidence presented, much of the evidence here was based on pure speculation. The jury could only guess who sent the texts." Appellant's argument attempts to isolate each piece of evidence out of context: he contends that (1) Cesar's testimony about a dark hoodie with white designs on it is unreliable because Cesar did not recognize any of the familiar logos and did not identify at trial the jacket police recovered from appellant, (2) Villareal's failure to initially tell Detective O'Brien about there having been a third man with appellant on the night of the shooting "[c]learly . . . should show" that Villareal changed his story to substitute appellant for the third man and to downplay Villareal's own role, (3) Detective O'Brien's information from Dorsey was hearsay and unreliable, (4) there are only two relevant phone records—the texts to Martin's phone about robbing "o boy" and "bro"—which appellant contends were taken out of context

24

(arguing that they were said in jest in reference to some girls appellant and Martin had met and that the "o boy" and "bro" referred instead to Martin's father),[12] (5) the phone records are inherently speculative because there is no way to identify who was using the phone at the time, and (6) the State's attempt to impeach appellant's alibi witnesses failed.

Appellant misapplies the relevant standard of review. When performing an evidentiary sufficiency review, we determine whether the necessary inferences are reasonable based upon the cumulative and combined force of the evidence when viewed in the light most favorable to the verdict. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011); *Hooper v. State*, 214 S.W.3d 9, 15–17 (Tex. Crim. App. 2007). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Dobbs*, 434 S.W.3d at 170. Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Dobbs*, 434 S.W.3d at 170; *Hooper*, 214 S.W.3d at 13. Moreover, we must consider all the evidence admitted at trial—even improperly admitted evidence,

---

[12]Although this is a possible way of interpreting the text messages, it is unlikely considering appellant's messages to Davis referencing "o boy" and the fact that several text messages from appellant's phone in the month before the murder mention getting or looking for a lick, often in proximity to other messages about his wanting drugs. *See Lewis v. State*, 448 S.W.3d 138, 145 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) (explaining that hitting a lick is a common euphemism for robbery or burglary), *petition for cert. filed* (U.S., May 8, 2015) (No. 14-9687). In any event, the jury was not required to interpret the phone evidence in the way appellant contends.

25

including hearsay—when performing a sufficiency review. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Poindexter v. State*, 153 S.W.3d 402, 406–09 (Tex. Crim. App. 2005).

Here, there is ample circumstantial evidence in the record as a whole from which the jury could have reasonably concluded that appellant shot Williams while robbing or attempting to rob him: (1) appellant was the only link between the other four defendants and Williams and was found with a jacket similar to the description given by Cesar, who not only heard the shooting but saw a man standing over Williams immediately afterward; (2) it can be reasonably concluded from the timing and context of the texts with Martin (and the other texts later in the evening on appellant's phone) and the call records that Martin picked up appellant and that the two were together using Martin's phone on the evening of December 27, 2012; (3) the location of phone messages confirms the location of Martin's phone near the apartments that night; (4) a car matching the description of Martin's was in the location of the apartments near the time of the murder; (5) Davis testified that appellant did not like Williams and suggested robbing him more than once; (6) Dorsey told Detective O'Brien that appellant mentioned getting back at Williams, that Williams carried dope and money with him, and that appellant had called him that night seeking ammunition; (7) messages on appellant's phone to Davis's number refer to "o boy" with no corresponding evidence that she knew or had contact with Martin's father, the person appellant suggests "o boy" refers to; and, finally, (8) Villareal testified about his involvement

26

in an attempted robbery instigated by appellant and Martin, in which Villareal supplied a .410 shotgun that would hold ammunition of the type that killed Williams.[13]   Moreover, in addition to the fact that the jury was entitled to disbelieve appellant's family alibi witnesses, the phone records in evidence cast doubt on their testimony.

Accordingly, we conclude and hold—in accordance with the appropriate standard of review—that the evidence is sufficient to support the jury's verdict. We overrule appellant's first issue.   Additionally, because the sufficiency standard in relation to appellant's community supervision revocation is a lesser standard, we overrule his seventh issue complaining that there was insufficient evidence to prove that he committed the new offense of capital murder.   *See Rickels v. State*, 202 S.W.3d 759, 763 (Tex. Crim. App. 2006).   We therefore overrule his seventh issue as well.

## Accomplice Witness Testimony

Appellant's sixth issue likewise relates to the sufficiency of the evidence. Appellant contends that there is not sufficient corroborating evidence to support the trial court's admission of Villareal's testimony.

"A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense

---

[13]As we explain below, there is sufficient evidence to corroborate Villareal's testimony linking appellant to the murder.

27

committed[,] and the corroboration is not sufficient if it merely shows the commission of the offense." Tex. Code Crim. Proc. Ann. art. 38.14 (West 2005).

When evaluating the sufficiency of corroboration evidence under the accomplice-witness rule, we "eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime." *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). To meet the requirements of the rule, the corroborating evidence need not prove the defendant's guilt beyond a reasonable doubt by itself. *Id.* Nor is it necessary for the corroborating evidence to directly link the accused to the commission of the offense. *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999), *cert. denied*, 528 U.S. 1082 (2000). Rather, the direct or circumstantial evidence must show that rational jurors could have found that it sufficiently tended to connect the accused to the offense. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011); *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009).

The sufficiency of nonaccomplice evidence is judged according to the particular facts and circumstances of each case. *Smith*, 332 S.W.3d at 442; *Malone*, 253 S.W.3d at 257. Circumstances that are apparently insignificant may constitute sufficient evidence of corroboration. *Trevino v. State*, 991 S.W.2d 849, 852 (Tex. Crim. App. 1999).

"[P]roof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances,

28

may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction." *Smith*, 332 S.W.3d at 443. But a defendant's mere presence at the scene of a crime is insufficient to corroborate accomplice testimony. *Malone*, 253 S.W.3d at 257.

We conclude and hold that the jury could have rationally found that other evidence sufficiently tended to connect appellant to the offense such that it corroborated Villareal's testimony. This evidence includes the substantive and locational phone records described above indicating that appellant was using Martin's phone, was near the location of the murder at the time it occurred, and was communicating with Villareal around the same time; Battles's testimony about the blue Impala he saw with two occupants matching Villareal's and Cordova's general descriptions; the red light camera video of the blue and silver-looking cars appearing to be following each other and moving toward the location of the apartments around the time of the shooting; Cesar's testimony about seeing a man with a similar jacket to the one found with appellant when he was arrested and to the fact that Williams's words sounded as if he knew the person who then shot him; and Davis's testimony and Dorsey's interview responses explaining why appellant would have wanted to rob Williams.

We overrule appellant's sixth issue.

### Leading Question

In his second issue, appellant contends that the trial court abused its discretion by admitting testimony about State's Exhibit 72, which is a photo of a

29

hand holding a handgun. The photo was taken on December 27, 2012 at 10:53 p.m. with Martin's iPhone. The following exchange occurred between the State and Special Agent Sedwick:

[State]: Were you able to obtain photographs from the camera roll of Jonathan Martin's phone?

[Sedwick]: Yes.

[State]: About how many photographs were on there? Was it many or just a few?

[Sedwick]: There were many.

[State]: Now, anybody that has an iPhone probably knows there's a setting where you can turn on GPS or a locater [sic], right?

[Sedwick]: If they know to look for it, yeah.

[State]: Did this Apple iPhone 4s have that option in the settings?

[Sedwick]: Yes.

[State]: Okay. And what does that -- what does that do? If it's switched on, what does that mean?

[Sedwick]: If you have your location settings turned on, some phones are more thorough than others with allowing you to select which apps have access to your GPS location. And with this one, it was turned on for the photos, so the GPS location was getting added to the photos being taken.

[State]: Okay. So is it fair to say just in layman's terms that when this phone was taking pictures, it was also recording where on planet Earth the phone was when the picture was taken?

[Defense]: Objection, Your Honor. This is leading.

THE COURT: Couldn't the witness have answered that question no?

30

[Defense]: I'm sorry, Your Honor?

THE COURT: I said couldn't the witness have answered that question no? Although he hadn't answered yet, but it sounded to me like the question, that could be answered yes or no.

[Defense]: Correct, Your Honor.

THE COURT: Doesn't a leading question suggest an answer?

[Defense]: Correct, Your Honor.

THE COURT: So all that question is suggesting is to answer yes or no. So I'll overrule your objection.

"Leading questions are questions that suggest the desired answer, instruct the witness how to answer, or put words into the witness's mouth to be echoed back." *Tinlin v. State*, 983 S.W.2d 65, 70 (Tex. App.—Fort Worth 1998, pet. ref'd). Unless a witness is a hostile witness, an adverse party, or a witness identified with an adverse party, leading questions should not be used on direct examination "except as necessary to develop the witness's testimony." Tex. R. Evid. 611(c); *Wheeler v. State*, 433 S.W.3d 650, 654–55 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). The rule thus contemplates that some leading questions—those "necessary to develop the witness's testimony"—are acceptable at the trial court's discretion. Tex. R. Evid. 611(c); *Newsome v. State*, 829 S.W.2d 260, 269–70 (Tex. App.—Dallas 1992, no pet.); *Myers v. State*, 781 S.W.2d 730, 733 (Tex. App.—Fort Worth 1989, pet. ref'd).

Appellant argues as follows:

In this example, the problem was not that the question was "yes or no", but that the prosecutor suggested an answer that the

31

witness had not come up with. The question should be "Did the witness adopt the prosecutor's suggestion as his own testimony?" Clearly here it did. The witness didn't come up with the idea that the picture indicated where on earth it was; the prosecutor came to that conclusion and asked the witness to agree with him. The trial court got the rule wrong. It was harmful in that it influenced the jury to believe the prosecutor's view of what the picture showed was necessarily what the witness thought.

Here, the State's question attempted to clarify Special Agent Sedwick's immediately preceding answer in simpler terms; however, in doing so, the question "ask[ed] for confirmation . . . in the words of the prosecutor." *Newsome*, 829 S.W.2d at 269. Therefore, the question was leading. *Id.*; *Myers*, 781 S.W.2d at 733. But because it was clarifying the witness's prior answer, it was not an improper leading question, and the trial court did not abuse its discretion by overruling appellant's objection. *Newsome*, 829 S.W.2d at 270; *Myers*, 781 S.W.2d at 733. We therefore overrule appellant's second issue.[14]

**Villareal's Prior Written Statement**

In his third issue, appellant contends the trial court abused its discretion by refusing to admit Villareal's prior written statement that appellant contends conflicted with Villareal's trial testimony.

The State initially argues that appellant did not preserve error because he sought to admit the statement only under rule 801 as an exception to hearsay. But appellant clearly sought to admit the testimony as a prior inconsistent

---

[14]Although appellant's brief references generally that there were numerous trial objections to leading questions by the State, this is the only specific question he challenges.

statement of the witness. *See* Tex. R. Evid. 613, 801; *State v. Rosseau*, 396 S.W.3d 550, 555 (Tex. Crim. App. 2013) ("Rather than focus on the presence of magic language, a court should examine the record to determine whether the trial court understood the basis of a defendant's request."); *Willover v. State*, 70 S.W.3d 841, 847 & n.10 (Tex. Crim. App. 2002).

A witness's prior inconsistent statement may be admitted if the questioning attorney first lays a proper predicate. *See* Tex. R. Evid. 613(a)(1)–(4); *Alvarez-Mason v. State*, 801 S.W.2d 592, 595 (Tex. App.—Corpus Christi 1990, no pet.). But the prior statement must actually be inconsistent with the witness's trial testimony. Tex. R. Evid. 613(a); *Alvarez-Mason*, 801 S.W.2d at 595; *see Willover*, 70 S.W.3d at 845–47. When a party attempts to admit evidence that contains both consistent and inconsistent statements, it is the party's responsibility to "specify and extract" the inconsistent statements he wishes to use for impeachment purposes. *Willover*, 70 S.W.3d at 847.

Here, Villareal's prior statement contained both consistent and inconsistent statements. Because appellant never attempted to admit only the inconsistent statements, we conclude and hold that the trial court did not abuse its discretion by excluding the evidence. Moreover, the trial court allowed appellant to question Villareal thoroughly about the inconsistencies in his voluntary statement. *See* Tex. R. App. P. 44.2(b). We overrule appellant's third issue.

33

## Admission of Photographs

In his fourth issue, appellant contends that the trial court abused its discretion by admitting photographs that he argues are substantially more prejudicial than probative. *See* Tex. R. Evid. 403.

In a rule 403 analysis, a trial court must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State,* 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). When photographs are admitted, we may also consider the number of photographs, their gruesomeness, their level of detail, their size, whether they are in color or black-and-white, whether they are close-ups, whether they depict a clothed or nude body, the availability of other means of proof, and other circumstances unique to the individual case. *Williams v. State*, 301 S.W.3d 675, 690 (Tex. Crim. App. 2009), *cert. denied*, 560 U.S. 966 (2010). When a photograph's power "emanates from nothing more than what the defendant himself has done[,] we cannot hold that the trial court has abused its discretion merely because it

admitted the evidence." *Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995).

Exhibit 15 is a photo of Williams lying on the ground with blood coming out of his mouth. The visible part of his body is clothed, his eyes are open, and the blood on his face and mouth is clearly visible. The photograph was admitted during Officer Glapa's testimony about his documentation of, and collection of evidence from, the crime scene. Over appellant's rule 403 objection, the State contended that the photograph "shows the condition of the victim and the wound that he received that night."

The medical examiner testified that Williams choked on his own blood, and Cesar testified that Williams was choking on his blood as he died. The photograph is consistent with their testimony about what happened. Although the photograph is of a dead person, it is no more gruesome than necessary and was unlikely to have confused, distracted, or improperly swayed the jury. Accordingly, we conclude and hold that the trial court did not abuse its discretion by admitting the evidence over appellant's rule 403 objection. *See Williams*, 301 S.W.3d at 692; *Alami v. State*, 333 S.W.3d 881, 890 (Tex. App.—Fort Worth 2011, no pet.) ("To the extent the photograph could be described as disturbing because it depicts a lifeless Kumar, the photograph portrays no more than the disturbing consequences of Alami's felony-murder offense.").

Exhibit 63 is a .410 shell casing that was not collected at the scene; the State proffered it through Lau's testimony to show what a typical .410 gauge shell

looks like. Appellant objected to the admission of the exhibit solely upon "it not being proven up and also the relevance of it." This general relevance objection is not the same as a rule 403 objection, and nothing in the record indicates that the trial court was aware that appellant intended to object on rule 403 grounds. *See Montgomery v. State*, 810 S.W.2d 372, 388–89 (Tex. Crim. App. 1991) (op. on reh'g); *Lopez v. State*, 200 S.W.3d 246, 251 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). Thus, we will not address appellant's rule 403 complaint regarding this exhibit. *See* Tex. R. App. P. 33.1(a)(1); *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009).

To the extent that appellant argues that the evidence was not relevant under rule 401, we conclude and hold that the trial court did not abuse its discretion. The photograph was admitted during Lau's testimony about the type of pellets and the shot cup that the medical examiners recovered from Williams's body. Lau testified that the photograph showed typically what an unfired casing looked like, but she did not say that it was a casing recovered at the scene. Because Lau's testimony involved the mechanics of what happens to shotgun ammunition once the gun is fired, we conclude and hold that the evidence was relevant under rule 401 and that the trial court did not abuse its discretion by admitting State's Exhibit 63.[15] *See* Tex. R. Evid. 401.

---

[15]Moreover, to the extent the evidence could be considered not to be relevant to the issues at trial, the State's questions and Lau's answers—in addition to appellant's questions and her answers when taking her on voir dire in the jury's presence—made it clear that the photograph was only meant to be

Exhibit 72 is a photograph of a hand holding a handgun that was found on Martin's iPhone; the phone's location settings showed that the photograph was taken at 10:53 p.m. on December 27, 2012 on the east side of Fort Worth, near the location of the shooting. Appellant objected that no one had identified a silver handgun as being involved in the case, and the line of questioning was solely about evidence found on Martin's phone. The State responded that "one of the previous witnesses [Villareal] testified that the reason he was contacted by [appellant] and the other people charged was because their pistols did not work. This is a photograph of a pistol [that] does not contain the clip, taken on the same day."

> On appeal, appellant argues,
>
> Clearly the picture of . . . Martin holding a gun had little if any relevance to whether [appellant] was involved in the crime. If anything it showed that . . . Martin needed bullets that night, not [appellant] as Detective O'Brien claimed he heard . . . Dorsey say. But even if this could be somehow concluded as relevant, the showing of a gun likely caused the jury to think this gun was the gun used in the felony murder, which it was not.

The photograph was probative of the location of Martin and his phone on the night in question. Additionally, the photograph of the gun served to corroborate Villareal's testimony about why appellant and Martin came to his house and asked for the shotgun. When the State asked Detective O'Brien if he recognized where the photograph was taken, he replied that it looked like the inside of a

representative and was not evidence found at the scene. *See* Tex. R. App. P. 44.2(b).

37

Chevy Impala because that is what he drives. The State had a need for the evidence to corroborate Villareal's testimony and because the rest of its case was based on appellant's whereabouts with Martin, Martin's phone, and the crime scene. The evidence was not unduly repetitive, nor would it have confused the jury; Martin's taking a picture of himself with a gun would have been irrelevant but for the evidence linking him to appellant, the location of the crime scene, appellant's activities that night, and appellant's knowledge of Williams and suggestions to Martin via text message that they rob "o boy" or "bro." We conclude and hold that the trial court did not abuse its discretion by admitting the photograph over appellant's rule 403 objection, and we overrule appellant's fourth issue.

## Impeachment Witness

In his fifth issue, appellant contends that the trial court abused its discretion by allowing the State to call a witness for the sole purpose of impeaching him with inadmissible hearsay evidence. *See* Tex. R. Evid. 607.

Any party, including the party that called the witness, may attack that witness's credibility. *Id.* However, the court of criminal appeals has observed that "the majority of jurisdictions still do not allow prior inconsistent statements to be used under the guise of impeachment for the primary purpose of placing substantive evidence before the jury which is not otherwise admissible." *Barley v. State*, 906 S.W.2d 27, 37 n.11 (Tex. Crim. App. 1995), *cert. denied*, 516 U.S. 1176 (1996). This restriction is analyzed in the context of a rule 403 analysis:

> [W]e conclude the State's knowledge that its own witness will testify unfavorably is a factor the trial court must consider when determining whether the evidence is admissible under Rule 403. Analyzing lack of surprise or injury in terms of Rule 403 is preferable not only because it comports with the plain language of Rule 607, but because it will lead to the conclusion that a trial court abuses its discretion under Rule 403 when it allows the State to admit impeachment evidence for the primary purpose of placing evidence before the jury that was otherwise inadmissible. The impeachment evidence must be excluded under Rule 403's balancing test because the State profits from the witness' testimony only if the jury misuses the evidence by considering it for its truth. Consequently, any probative value the impeachment testimony may have is substantially outweighed by its prejudicial effect.

*Hughes v. State*, 4 S.W.3d 1, 5 (Tex. Crim. App. 1999) (footnote omitted). The key issue is the State's knowledge—before calling the witness—that the witness will testify unfavorably. *Kelly v. State*, 60 S.W.3d 299, 301 (Tex. App.—Dallas 2001, no pet.).

When the State told the trial judge of its intent to call Dorsey as a witness, the trial judge asked, "Is this the one that doesn't want to be here?" The State replied affirmatively. The State's first questions to Dorsey involved whether he remembered the prosecutor and two investigators coming to his house the week before the trial. Dorsey denied remembering such a meeting. He said he did not remember the State's serving a subpoena on him, nor did he remember telling the prosecutor that he did not intend to appear. He further denied not showing up to court pursuant to the subpoena. He only "kind of" remembered having been arrested and brought to court earlier in the week of the trial because he said he had taken promethazine and Xanax that day. He denied knowing a

person by the name of L.A., and he denied knowing appellant. He also denied having thrown a sign at appellant when walking into the courtroom.

Dorsey likewise did not recall having given a statement to Detective O'Brien. When the State began questioning Dorsey about his statement to Detective O'Brien, appellant objected as follows: "Dorsey just testified that he doesn't remember giving any statement back in . . . December. So . . . we see where the State is going with this and plans to read out and go through any sort of statement. This witness has just testified he doesn't remember . . . giving a statement." The trial court overruled the objection stating,

> I believe if they can prove he gave a statement, then they're entitled to impeach him through the use of that statement, so I'm not going to tell her she can't ask him about a statement unless you've got some good proof that he really did not give a statement.

When the State asked Dorsey about a specific statement he had made during his interview with Detective O'Brien, Dorsey did not say that he did not recall; he simply denied having made the statement. He also denied that appellant had contacted him and said he "planned to rob his baby mama's boyfriend for some cocaine and some money" and that appellant had asked him for ammunition. He denied knowing Martin or Martin's cousin. Finally, during the State's direct examination of Detective O'Brien about his interview with Dorsey, appellant objected on hearsay grounds but only after Detective O'Brien had already answered several questions about Dorsey's statement.

40

It is unclear whether appellant's objection at trial comports with his complaint on appeal because it is unclear whether the trial court understood appellant's first objection to mean that the State had called Dorsey solely for the purpose of impeaching him with inadmissible hearsay evidence, knowing in advance that he would deny having made the statement to Detective O'Brien. The trial court did appear to understand that appellant was objecting to the State's attempting to impeach Dorsey with the admission of the statements. However, to the extent that appellant preserved his appellate complaint, we nevertheless conclude and hold that the trial court did not abuse its discretion by overruling appellant's objection because the record does not show that the State knew that Dorsey would deny having made the statements to Detective O'Brien. Instead, it shows only that the State knew Dorsey did not want to appear or testify at trial. *See, e.g., Ruth v. State,* 167 S.W.3d 560, 566 (Tex. App.— Houston [14th Dist.] 2005, pet. ref'd); *Kelly*, 60 S.W.3d at 302 ("In this case, although the State 'suspected' its witness could turn, it had no reason to know this for certain."); *see also Barley*, 906 S.W.2d at 37 n.11 (noting that in cases in which State could be charged with "subjective *primary* intent of placing otherwise inadmissible substantive evidence before the jury," the witnesses had already recanted their statements "in prior sworn testimony at a previous trial or hearing"). Regardless, if the trial court had abused its discretion by admitting Dorsey's statement, the admission would be harmless in light of the record as a whole; the phone records established a link between Dorsey and appellant,

41

including the text to appellant's phone from Dorsey's the morning after the murder.  *See* Tex. R. App. P. 44.2(b); *Motilla v. State*, 78 S.W.3d 352, 356–57 (Tex. Crim. App. 2002).  Appellant did not object to the evidence related to Dorsey's phone number, and the phone records were crucial linchpins of the State's case.  Therefore, we overrule appellant's fifth issue.

## Conclusion

Having overruled appellant's seven issues, we affirm the trial court's judgments.

PER CURIAM

PANEL:  LIVINGSTON, C.J.; WALKER and SUDDERTH, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  October 15, 2015